1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9
10
11
12
13
14

| JESSE WESLEY, | Case No. 2:18-CV-00466-RSL |
| Plaintiff, | |
| v. | ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| CBS RADIO SERVICES, INC. et al., | |
| Defendants. | |

15    This matter comes before the Court on the motion for summary judgment[1] filed by

16 defendants CBS Radio Stations, Inc., CBS Radio Services, Inc., CBS Broadcasting, Inc.,

17 Viacom Radio, Inc., Michael Fashana and Cindy Johnson. Dkt. #42.

18                                    **BACKGROUND**

19
20    This case arises out of plaintiff Jesse Wesley's employment as a Digital Sales Specialist

21 ("DSS") and Account Executive ("AE") with CBS Radio Stations, Inc. ("CBS") in Seattle,

22 Washington from 2014 to 2016. Plaintiff brought claims for violation of Washington's Law

23

24    [1] This matter can be decided on the briefing filed by both parties. Plaintiff's request for oral
25 argument is accordingly denied. See Dkt. #48. Plaintiff also argues that the motion should be deferred or
   denied because he has not been provided with "the wage records for all the employees for the relevant
26 periods of time". Id. at 22. This includes the "paystubs of all DSS and AE employees in the Seattle
   Market between 2014-2017." Dkt. #53 (Silke Decl. II) at ¶ 4. Plaintiff does not explain why this
27 information is relevant. He does not claim any discrimination regarding his wages or salary vis-à-vis
   other employees. See generally Dkt. #1-2 (Compl.). The Court proceeds to rule on the motion.
28

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 1

Against Discrimination ("WLAD"), see RCW 49.60.010 *et seq.*, violations of the Family Medical Leave Act ("FMLA") and Washington's Family Leave Act ("FLA"), wrongful termination in violation of public policy, failure to accommodate, intentional infliction of emotional distress and negligent infliction of emotional distress. Dkt. #1-2 (Compl.) at ¶¶ 4.1.1– 4.6.1. Defendants removed the case to this Court on March 29, 2018. Dkt. #1; see 28 U.S.C. § 1331. In his "Motion for Leave to Amend Complaint", plaintiff requested leave to add a claim for racial discrimination pursuant to 42 U.S.C. § 1981(a) and the dismissal of his causes of action for intentional and negligent infliction of emotional distress. Dkt. #24. The Court granted plaintiff's motion on June 17, 2019. Dkt. #63. Plaintiff accordingly filed a Second Amended Complaint on June 21, 2019, see Dkt. #64, but defendants moved for summary judgment prior to that date. Dkt. #42. The causes of action that are the subject of this motion, therefore, are violations of the WLAD, FMLA and FLA, wrongful termination in violation of public policy, and failure to accommodate.

### A. CBS's Hiring of Plaintiff

Plaintiff was hired as a DSS on June 10, 2014. Ex. E, Dkt. #43-5 at 2. He had a base yearly salary of $50,000 plus commissions. Id. at 3; see Dkt. #49 (Wesley Decl.) at ¶ 4. Generally, DSS's were provided with a "salary in perpetuity and they received a commission on top of that … which was generally anywhere from 15 to 18 percent." Ex. A, Dkt. #50-1 (Baker Decl.) at 12:11–17. Plaintiff acknowledged receipt of CBS's Non-Discrimination and Anti-Harassment Policy on the same day. Ex. E, Dkt. #43-5 at 7.

At the time that he was hired, plaintiff was interviewed by defendant Michael Fashana, defendant Cindy Johnson, Kevin McCarthy and Angel Olson. Ex. M, Dkt. #49-13 (Wesley Dep.) at 39:11–23. At his deposition, plaintiff testified that he did not inform any of those four individuals that he suffered from depression. Id. He informed them that he had been through a period of depression after his brother's suicide. Id. at 39:24–40:18. But when asked by Fashana, "Well, how are you now? Is your head right?", he responded, "Yes, sir." Id. at 40:19–41:1. He did not inform any of them of any disabilities that he had at the time that might have affected his

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 2

1    ability to do his job. Id. at 41:22–42:2. He did not ask for any accommodations. Id. at 42:3–8.

2    Fashana does not "recall any time that Plaintiff informed him that Plaintiff or his family member

3    suffered [from] 'depression' or 'anxiety.'" Ex. H, Dkt. #43-8 at 10–11. Neither does Johnson.

4    Ex. I, Dkt. #43-9 at 10. The only medical condition that plaintiff informed them of was a

5    miscarriage allegedly suffered by his wife. Id.; Ex. H, Dkt. #43-8 at 11; see also Ex. B, Dkt.

6    #43-2 at 12–13. Plaintiff testified that he believes that he "did have a severe depression

7    disability [but] didn't have any flare-ups that would prohibit [him] at that time from doing [his]

8    job." Wesley Dep. at 43:2–4. In the declaration filed with his response to defendants' motion for

9    summary judgment, however, plaintiff states that he "personally informed Defendants during

10   [his] initial interview that [he] suffered [from] depression that was aggravated by [his] brother's

11   recent death and that [his] struggles from depression were the reason that [he] was terminated

12   from Townsquare." Dkt. #49 (Wesley Decl.) at ¶ 3. On a Personal Information Form dated June

13   10, 2014, under "Disability Status", plaintiff ticked the box that stated, "I am an individual with

14   a disability." Ex. B, Dkt. #50-2; see Wesley Decl. at ¶ 3.

15           **B.  Plaintiff's Employment as a Digital Sales Specialist**

16

17           Plaintiff missed his first day of work. Wesley Dep. at 86:6–87:23. He informed Fashana,

18   who "just told [him] to go home and get rest, come back the next day with [his] A game." Id. at

19   88:15–20. He was not reprimanded or disciplined in any way. Id. at 88:21–23.

20           "As a general rule, all salespeople [at CBS] [were] given a salary for the first six to

21   twelve months and then [were] given a budget by their ninetieth day of employment." Ex. B,

22   Dkt. #43-2 at 5. There was no specific policy on setting budgets. Ex. A, Dkt. #50-1 (Baker Dep.

23   II[2]) at 59:6–11. During that initial period of 90 days, CBS assessed "how they were doing, how

24   much business they had on the books, how much business they had in the funnel, what their

25

26           [2] Plaintiff and defendants have both attached excerpts of Baker's deposition, taken on January 9,
     2019. Ex. M, Dkt. #43-13; Ex. A, Dkt. #50-1. For the sake of clarity, the Court will refer to defendants'
27   set of excerpts as "Baker Dep." and plaintiff's set of excerpts as "Baker Dep. II", although there is some
28   overlap.

     ORDER GRANTING DEFENDANTS'
     MOTION FOR SUMMARY JUDGMENT - 3

aptitude was." Id. at 59:6–21. A "reasonable budget" would then be assigned, taking CBS's revenue needs into consideration. Id. at 59:22–60:23. It was an "evolving process" and the budget was generally revised quarterly. Id. at 60:10–23. Plaintiff stated that he was not given a budget "from the first month that [he] was hired" and that "during the first two months of [his] employment, [he] was not told that [he] had a budget." Wesley Decl. at ¶¶ 5, 8. CBS expected salespersons like plaintiff to be at a certain percentage of their budgets, to come to work on time, and to dress and behave professionally. Baker Dep. II at 65:19–66:9.

From July to September 2014 (i.e., during the initial period), plaintiff had a budget of $10,000. Ex. E, Dkt. #43-5 at 42. He billed $500 in July, $7,800 in August, and $4,000 in September. Id. Between October and December 2014, plaintiff had a budget of $12,000 per month. Id. at 41; see Baker Dep. II at 51:06–10. Plaintiff billed $4,000 in October, $2,000 in November, and $6,200 in December. Ex. E, Dkt. #43-5 at 41. Overall, between June and October 2014, he met 38% of his budget. Id. at 42. Generally, CBS  expected its salespersons over a six-month period to meet their budgets over 50% of the time. Plaintiff failed to achieve those goals. Baker Dep. II at 51:11–17. It was not mandatory that every employee hit their budget in each month or quarter, but employees "had to show that [they] were consistently meeting it more often than not." Id. at 85:6–11. Plaintiff, however, claims that he received oral and written praise for his work and was under the impression that he was meeting his supervisors' expectations. Wesley Decl. at ¶ 6. He states that he was "always the first to arrive at work" and left late. Id. On December 30, 2014, plaintiff received an email from Olson. She stated that plaintiff had had a "good year" and that he was "at the #2 position in Seattle for digital revenue". Ex. 3, Dkt. #49-3 at 8–10. Plaintiff does not dispute that he did not meet his budget targets. See Dkt. #48 at 2–4.

**C. Transition to Account Executive**

According to CBS, due to his lack of success as a DSS in achieving his budget numbers, plaintiff was switched from a DSS to an AE effective January 1, 2015. Baker Dep. at 22:15–22. His managers "felt that he had the aptitude to be successful as an account executive. They felt

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 4

that he was very aggressive in his pursuing of clients, that he had some decent relationships, that he certainly had the passion for the industry and for the stations, … [but] wasn't able to be focused just on digital and … would attempt to sell all of [CBS's] assets." Id. at 22:23–23:5. DSS's focused on selling only the digital aspects of the station. Id. at 23:17–23. CBS "wanted to see [plaintiff] succeed." Id. at 50:8–25.

Plaintiff, however, casts this as a demotion. Wesley Decl. at ¶ 8. There was no change in salary, although CBS made changes around the same time to the commission structure applicable to all Seattle AEs. Ex. E, Dkt. #43-5 at 43–49. Plaintiff does not dispute that there was no change in his salary. Dkt. #48 at 4. AEs were generally provided with a guaranteed salary plus commission for a certain amount of time and then, depending on the kind of business procured, they eventually dropped down to a draw against commissions, typically within a year. Baker Dep. II at 12:18–13:7.

The decision to transfer plaintiff was made by Olson, Fashana, Johnson and McCarthy. Baker Dep. at 67:20–24. Baker initially testified that plaintiff was not given a warning or reprimand prior to being transferred to the AE position. Baker Dep. II at 53:16–20. She later testified that he received a verbal warning prior to the transfer. Baker Dep. at 67:25–68:3. He was told that he wasn't "very successful in his job," particularly in terms of meeting his budgets, and "that they thought that he would be much more successful in an AE position." Id. at 68:4–9. In general, CBS had a policy of issuing warnings if employees were not meeting their supervisors' expectations. Baker Dep. II at 62:6–63:20. Plaintiff testified that he was told that he was not making anything near what CBS wanted him to make in his first six months and that it was time for him to move over. Wesley Dep. at 112:15–24.

Plaintiff was not given an opportunity to better his sales after the warning. Baker Dep II at 68:10–22. Plaintiff and Fashana had discussed plaintiff's performance in regular one-on-one meetings prior to the decision. Id. 68:10–22. According to witnesses present at the meeting, plaintiff "seemed fine with" the shift. Id. 69:23–25.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 5

**D. Employment as an AE and Billing Accounts**

Between January 2015 and June 2016, plaintiff's budget varied between $44,000 and $77,000. Ex. F, Dkt. #43-6; see Dkt. #43 (Silke Decl.) at ¶ 8. Each month, plaintiff achieved between 3% and 50% of his budget, with an average of 37% in 2015 and 18% in 2016. Id. More often than not, the majority of his colleagues did significantly better. Ex. G, Dkt. #43-7. However, on March 18, 2015, he received an email from Olson praising his work. Ex. 3, Dkt. #49-3 at 8–10 ("You are rocking your Q1 digital budget… 79% in and need to add $7,600 more to hit your budget or $36,000!").[3] Plaintiff also won a gift card in CBS's digital sales month contest on April 13, 2015. Id. at 1–4. In that month, he achieved 44% of his budget, higher than four of his colleagues and lower than another four of them. Ex. G, Dkt. #43-7 at 2. On January 19, 2016, an email was sent out to the team congratulating plaintiff on his sale to Issaquah Honda Kubota. Ex. 3, Dkt. #49-3 at 5. Overall, in January, he achieved 12% of his budget, which was significantly lower than his colleagues' percentages of 81%, 92%, 87% and 64%. Ex. G, Dkt. #43-7 at 2.

According to plaintiff, "billing accounts" are accounts with clients who have previously done business with CBS. Wesley Decl. at ¶ 10. They are "desirable accounts because it is highly likely that these clients will keep billing, which results in commissions without having to prospect new clients." Id. Plaintiff requested that he be assigned these accounts and was not. Id. at ¶ 11; see Baker Dep. at 73:15–17; see Ex. E, Dkt. #43-5 at 29–30. This, according to CBS, is because he had to "prove himself." Id. at 73:20–24; see Wesley Decl. at ¶ 10. There were concerns about him failing to meet his budgets as a DSS, as well as his lack of understanding of CBS's business and his ability to grow the accounts that he already had. Baker Dep. at 73:23–76:9. To earn these accounts, plaintiff needed to "obtain[] his budgets, hav[e] sufficient business

---

[3] It is not clear to the Court what these numbers signify. They appear to be inconsistent with those available in an exhibit attached to David Silke's declaration. Ex. F, Dkt. #43-6 at 2. That table lists budgets for plaintiff in the amounts of $50,000 for January, February, and March 2015. Plaintiff achieved 18%, 28% and 3% of those budgets respectively. Id. Regardless, plaintiff does not appear to dispute that he did not meet his budgets. See Dkt. #48 at 2–4.

in the sales funnel, establish[] more relationships with clients and hav[e] the operational acumen that the sales department required." Id. at 83:17–25. In general, CBS did not have any formal or written policies and procedures for the assignment of these accounts. Ex. J, Dkt. #43-10 at 4. It was left to the discretion of local market management, who "took into consideration a variety of factors including but not limited to the strengths and weaknesses of individual employees, the time commitment required for each account, the sophistication and specific needs of the clients, and other factors as appropriate." Id.; see Ex. K, Dkt. #43-11 at 4.

Plaintiff claims that his coworkers were assigned these accounts without having to earn them. Specifically, he states that a Caucasian female employee named Jocelyn Macdonald was hired in February 2015 and was assigned the accounts that he had been requesting. Wesley Decl. at ¶ 12; see Ex. A, Dkt. #49-1. Macdonald had no sales experience. Dkt. #52 (Fashana Decl.) at ¶ 2. However, according to Fashana, she "worked hard, learned quickly and was a natural born leader. Even as a person new to the business, [Macdonald] found accounts, was a leader in the building and earned the assignment of the accounts that were given to her. She was generally a very good sales person. Once she took over an account, she delivered results for the company." Id. By contrast, plaintiff "did not demonstrate the same skill level, even though he had much more media sales experience." Id. at ¶ 6. Decisions on account assignments "had to be made in the best financial interest of both [CBS's] clients and CBS and a person's race, gender, or disability played no role in [their] decision making." Id. at ¶ 7.

### E. Complaint Against Fashana and Retaliation

On April 6, 2015, plaintiff submitted a complaint to Baker against Fashana, claiming that he had been bullied, harassed and "forced to do unethical things that [he] disagreed with." Ex. E, Dkt. #43-5 at 49; see Baker Dep. at 70:18–71:7. He submitted supplemental documentation on April 8, 2015, describing the unethical conduct, and on April 10, 2015, containing examples of treatment he believed to be humiliating. Ex. E, Dkt. #43-5 at 50–54. Part of his complaint concerned the assignment of billing accounts and his transfer from a DSS to an AE. Id. at 52–53.

1   Baker conducted a formal investigation and determined that there was no evidence to

2   support any bullying or harassing by Fashana. Ex. E, Dkt. #43-5 at 55; see Baker Dep. at 71:8–

3   25. Nor did she identify any discriminatory or hostile treatment by Fashana that was specific to

4   plaintiff. Baker Dep. at 71:14–18. She did not identify any signs that plaintiff was receiving less

5   favorable treatment than the other AEs or that his budgets were higher than those of other AEs.

6   Id. at 73:5–12. Rather, Baker determined that Fashana "ha[d] attempted to support [plaintiff's]

7   efforts to be successful at [CBS]." Ex. E, Dkt. #43-5 at 55. She also stated that some of

8   plaintiff's colleagues were intimidated by plaintiff's behavior. Id. Finally, she reminded plaintiff

9   that CBS did not tolerate "any retaliation against any individual who [brought] concerns or

10   issues to [their] attention." Id. She requested plaintiff to contact her if he ever felt that he was

11   being subjected to retaliation. Id. Baker also found that Fashana had not done anything unethical

12   regarding the client accounts. Baker Dep. II at 78:23–81:21.

13   On August 1, 2015, plaintiff's compensation structure changed from $50,000 per year

14   plus commission to commission only. Wesley Decl. at ¶ 17. In his complaint, he alleged that this

15   was a form of retaliation.[4] Compl. at ¶ 3.25; see Dkt. #48 at 10. His Personnel Action Form

16   indicates that at the time of his resignation in 2016, he was paid a base salary of $36,000. Ex. E,

17   Dkt. #43-5 at 8–13. Plaintiff signed a "CBS Radio Account Executive Standard Agreement" on

18   June 23, 2015 that explained CBS's calculations of commissions and stated that CBS would pay

19   plaintiff a draw against commissions in the amount of $3,000 per month. Id. at 16–21. All AEs

20   were generally provided with a guaranteed salary plus commission for a certain amount of time

21   and then, depending on the kind of business that they procured, they eventually dropped down to

22   a draw against commissions, typically within a year. Baker Dep. II at 12:18–16:8.

23

24

25   [4] Plaintiff claims that this was retaliation for his complaint against Fashana as well as another
complaint that he made on June 18, 2015, "about the disparate treatment towards him that was
26   preventing him [from] [having] the same work conditions as other Caucasian, non-disabled co-workers
who had less seniority." Compl. at ¶ 3.24. There is no indication that plaintiff specifically complained
27   about receiving disparate treatment on the grounds of race, gender, or disability at the time. See Wesley
Dep. at 113:4–19. Nor does plaintiff allege this in his response. Dkt. #48 at 9–10.
28

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 8

1   Plaintiff also alleged in his complaint that Fashana and Johnson retaliated by "almost

2   doubling his quarterly budget for the third quarter and continuing to deny his requests for

3   lucrative client accounts." Compl. at ¶ 3.26. There was no specific policy for setting budgets for

4   AEs or DSS's. Baker Dep. II at 59:6–11. Many factors were taken into consideration, and it was

5   an evolving process. Id. at 59:12–60:23. "Different markets did it in different ways." Id. at 60:3.

6   "During the relevant time period, team budgets were set on a quarterly basis by corporate CBS,

7   and [] Fashana worked in unison with market managers to distribute the total budget to

8   individual employees based on a variety of factors including but not limited to historical account

9   spending, new business objectives, and time and tenure with the company." Ex. J, Dkt. #43-10

10   at 5; see Ex. K, Dkt. #43-11 at 5. Regardless, plaintiff's budgets were in fact at the lower end

11   compared with his colleagues. Ex. E, Dkt. #43-7 at 3.

### F. Wesley's Medical Leave

14   On January 27, February 2, February 10, February 12, February 17 and March 19, 2015

15   plaintiff took time off from work to attend medical appointments. Ex. A, Dkt. #43-1 at 43–52.

16   The emails that plaintiff sent to Fashana and Johnson informing them of these appointments do

17   not mention any specifics or request any accommodations. Id. He also took time off to attend his

18   grandfather's funeral in March 2015. Id. at 52, 56.

19   On November 20, 2015, plaintiff sent an email to Johnson stating that his doctor wanted

20   him to take time off for a "serious health condition." Ex. A, Dkt. #43-1 at 53. He indicated that

21   he would "let [her] know what [was] going on" after his next appointment. Id. Around this time,

22   per CBS's policy, Baker had a conversation with him in which she explained to plaintiff what he

23   needed to do to file for disability. She "provided him with his FMLA paperwork and told him

24   what the expectations were going forward as far as his pay and to be approved for disability and

25   what he was eligible for." Baker Dep. at 99:21–100:7. His healthcare provider filled out a

26   "Certification of Health Care Provider for Employee's Serious Health Condition" under FMLA

27   on November 23, 2015. Ex. E, Dkt. #43-5 at 24–26. He declined to answer the question asking

28   about relevant medical facts, citing the Health Insurance Portability and Accountability Act

("HIPPA"). Id. at 25. The provider stated that plaintiff could not perform his job duties "during exacerbations". Id. He indicated that plaintiff would need a reduced work schedule, although he could not yet provide specifics, and stated that it was medically necessary for plaintiff to be absent from work "during the flare-ups". Id. at 26. On December 16, 2015, plaintiff sent another email stating that his doctor "[had] him out until January 15, 2016" and that he needed to see more medical specialists. He asked if more paperwork was needed. Ex. A, Dkt. #43-1 at 54.

Plaintiff states that he was still assigned a budget while on leave and was unable to meet it because of the time off. Wesley Decl. at ¶ 19. Time taken off from work was not taken into consideration in setting a budget but was considered in evaluating the achievement of it. Baker Dep. II at 61:5–9. "Usually people would be given more time to achieve their budgets or … if they had charge-backs where [CBS] would recapture the money because someone hadn't paid, [CBS] would give them additional time to try and get that money from the client back." Id. at 61:9–16. Budgets were not adjusted. Ex. B, Dkt. #43-2 at 14. "Rather, the employees were encouraged to do their best to meet the previously set budgets or goals to the extent reasonably practicable, taking into the account … the individual circumstances such as the amount of time of leave." Id. While plaintiff was on medical leave, Johnson and Olson supervised his accounts. Id. Plaintiff concedes that CBS always granted his leave requests. Wesley Dep. at 149:24–150:6; Baker Dep. II at 113:23–114:8. Other than requesting medical leave, plaintiff only asked to be able to work from home occasionally. Id. at 192:13–17. He initially testified that those requests "were somewhat granted with gritting teeth", id. at 192:20–23, then stated that he would have to think about whether any were ever denied. Id. at 193:8–14.

CBS's policy states, "If the employee requires a reasonable accommodation to return to work after a disability leave of absence, CBS will engage in the interactive process with the employee, and if appropriate, with the employee's medical provider, to determine whether a reasonable accommodation exists that will permit the employee's return to the workplace, including but not limited to an extension of the leave period." Ex. E, Dkt. #43-5 at 64–65. Plaintiff returned to work on January 15, 2016. Baker Dep. at 146:2–6. CBS relied on its

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 10

employees to initiate conversations regarding accommodations. Id. at 146:7–8. Plaintiff's
paperwork did not indicate any restrictions or accommodations. Id. at 146:9–14. There was no
indication that plaintiff requested any accommodations. Id. at 146:15–24. Plaintiff does not
claim that he did so in his response. See Dkt. #48.

### G. Wesley's Performance Improvement Plan and Voluntary Resignation

When plaintiff returned, "there was concern about the business that he had in the funnel".
Baker Dep. at 107:13–21. After a month of working with him and reviewing his business, CBS
wanted to put him on a performance plan "to put him on a track to be successful". Id. at 107:14–
108:2. Baker testified that this was a way to get employees to step up, rather than a prelude to
letting them go. Id. at 108:3–12. Johnson discussed plaintiff's performance with him following
his return to work. Ex. E, Dkt. #43-5 at 27–28; Ex. F, Dkt. #49-6 at 1–2.  Plaintiff received a
"Performance Expectations" memorandum on February 18, 2015. Ex. E, Dkt. #43-5 at 27–28;
Ex. F, Dkt. #49-6 at 1–2. This stated:

> Currently you are at a commission deficit of around $9,000. We've been flexible
> in allowing you time to ramp up your business due to your leave of absence at the
> end of 2015/early 2016, but you've now been back a month and we would expect
> to see more business in your funnel. You are currently at 7% of your overall
> budget for February and you are currently pacing at 19% of your budget of March.
> It is imperative that you improve your revenue numbers to help secure your
> income.

Id. at 27. The memorandum also outlined a 30-day plan for plaintiff, setting goals
regarding his budget, face-to-face appointments, presentations, sales and meetings. Id. Finally,
the memorandum clarified that certain performance standards had to be met for plaintiff to
continue his employment with CBS. Id. at 28. Plaintiff acknowledged receipt of the
memorandum on the same day. Id. He describes this as a "high standard because it takes at least
four weeks before one can build sales prospects and then convert them into sales." Wesley Decl.
at ¶ 21. He believed this to be a considerable change in his employment terms because he had
been reassured prior to his medical leave that hitting his budget was not required and that he was
doing a good job. Id. at ¶ 22; see Ex. G, Dkt. #49-7. The reassurance to which plaintiff refers is

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 11

1    in an email from Johnson on September 28, 2015, and it is in response to plaintiff raising

2    concerns about his budget. Johnson stated that plaintiff had the lowest budgets on the staff. Id.

3    Her exact words were, "At the end of the day, you are paid on what you sell and there are no

4    penalties for not hitting budget." Id. On February 25, 2016, plaintiff wrote to McCarthy and

5    Johnson expressing his concerns with meeting his target in March, given that the sales cycle

6    often took three to four weeks, and requesting that he be assigned billing accounts. Ex. E, Dkt.

7    #43-5 at 29–30. The accounts were not reassigned. McCarthy agreed that the sales cycle could

8    take three to four weeks but stated that plaintiff had already been back for almost six weeks and

9    had presumably been forming relationships prior to his medical leave. Id. at 29. On the same

10   day, McCarthy smelled alcohol on plaintiff's breath during their 9:00 a.m. meeting. Ex. E, Dkt.

11   #43-5 at 31. According to McCarthy, plaintiff said that he had drunk a lot the night before

12   because he was afraid that he was going to be fired the next day. Id. McCarthy informed

13   plaintiff that it was unacceptable to smell of alcohol at the workplace. Id. at 32.

14        Typically, employees received one or two performance reviews in writing prior to

15   termination. Baker Dep. at 108:13–17. Baker testified that plaintiff's Performance Improvement

16   Plan would not "have been the end of things for him", because plaintiff had been there for a

17   while, had "been on disability", and CBS would have wanted to "offer him the opportunity to …

18   ramp up his business more." Id. at 108:19–25. On March 23, 2016, plaintiff told McCarthy that

19   he intended to resign. According to McCarthy, plaintiff said that he wanted to "delay the

20   resignation so that he could check himself into rehab while he still [had] CBS benefits, as he

21   [was] broke and [did] not have insurance." Ex. E, Dkt. #43-5 at 34. However, plaintiff then

22   resigned later that day. Id. at 10.

23                                          **DISCUSSION**

24   **A. Legal Standard**

25        A party is entitled to summary judgment if it "shows that there is no genuine dispute as to

26   any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

27

28

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 12

56(a). "The proper question … is whether, viewing the facts in the non-moving party's favor, summary judgment for the moving party is appropriate." Zetwick v. Cty. of Yolo, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). "[W]here evidence is genuinely disputed on a particular issue—such as by conflicting testimony—that 'issue is inappropriate for resolution on summary judgment.'" Id. (citation omitted). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses". Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986).

"Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). "On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." Id. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

## B. Admissibility of Employment with Townsquare and Criminal Conduct

Plaintiff disputes the admissibility of two pieces of evidence. First, while employed at CBS, plaintiff filed a lawsuit in the Eastern District of Washington against his former employer, Townsquare Media West Central Radio Broadcasting ("Townsquare"), bringing similar claims for violations of FMLA, FLA, and WLAD. Ex. N, Dkt. #43-14 at 2. The Court granted defendants' motion for summary judgment. Id.; see Ex. O, Dkt. #43-15; Ex. P, Dkt. #43-15. Second, plaintiff was charged with attempted assault and harassment on December 14, 2015, while he was on medical leave from CBS. Wesley Dep. at 60:9–61:3. The Court does not consider this evidence in its decision. See Fed. R. Evid. 404.

**C. FMLA and WLA Claims**

The FMLA entitles "covered employees to up to twelve weeks of leave each year for their own serious illnesses or to care for family members, and guarantees them reinstatement after exercising their leave rights." Bachelder v. Am. W. Airlines, Inc., 259 F.3d 1112, 1119 (9th Cir. 2001). "The Washington Family Leave Act 'mirrors its federal counterpart and provides that courts are to construe its provisions in a manner consistent with similar provisions of the FMLA.'" Crawford v. JP Morgan Chase NA, 983 F. Supp. 2d 1264, 1269 (W.D. Wash. 2013) (citation omitted). All of plaintiff's requests for medical leave were granted. Wesley Dep. at 149:24–150:6. Plaintiff does not argue otherwise.

"An employer may not use FMLA leave as a negative factor in employment decisions". Liston v. Nevada ex rel. its Dep't of Bus. & Indus., 311 F. App'x 1000, 1002 (9th Cir. 2009). The FMLA protects an employee against disciplinary action based on his absences if they are taken for one of the FMLA's enumerated reasons. Bachelder, 259 F.3d at 1125. To prevail on a claim, plaintiff must prove "by a preponderance of the evidence that [his] taking of FMLA-protected leave constituted a negative factor in [the employment decision]. [He] can prove this claim … by using either direct or circumstantial evidence, or both." Id. Plaintiff claims that defendants retaliated against him by changing the terms of his employment and requiring that he hit his budgets in his Performance Improvement Plan. Dkt. #48 at 18–20. The Court disagrees.

First, Baker testified that CBS expected its salespersons over a six-month period to meet their budgets over 50% of the time. Baker Dep. II at 51:11–17. It was not mandatory that every employee hit their budget in each month or quarter, but employees "had to show that [they] were consistently meeting it more often than not." Id. at 85:6–11. The fact that plaintiff occasionally received praise for his work does not take away from the fact that there were established metrics for evaluating his performance. Indeed, plaintiff would have been aware of them from his career in the field, as well as a verbal warning prior to his transfer to an AE position, see id. at 67:25–68:9, and his one-on-one meetings with Fashana, see id. at 68:10–22, prior to his taking any leave. The only evidence plaintiff produced is an email from Johnson stating that there were no

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 14

1   "penalties" for not meeting budgets. Ex. G, Dkt. #49-7. This shows only that plaintiff would be

2   paid for whatever he sold, not that there was no expectation that he meet his budgets. Second,

3   plaintiff was warned in his Performance Improvement Plan that it was "important for [him] to

4   understand that this [was] a critical juncture in [his] employment and [that] [his] success or

5   failure was entirely up to [him]", but he has not shown that the Plan made the meeting of his

6   budgets an explicit condition of his employment. Ex. E, Dkt. #43-5 at 28; Ex. F, Dkt. #49-6 at 2.

7       Third, even assuming that the Plan was a change in employment terms, defendants have

8   shown that plaintiff was put on it because of concerns that predated his medical leave and

9   continued into the month after he returned. Baker Dep. at 107:13–108:2. CBS did not officially

10  set a budget for the initial 90 days of employment, id. at 59:6–21, and plaintiff stated that he was

11  not told he had a budget in his first two months. Wesley Decl. at ¶¶ 5, 8. From October 2014,

12  however (more than three months after he was hired), to January 2016, plaintiff consistently

13  failed to meet his budgets. Ex. E, Dkt. #43-5 at 41–42; Ex. F, Dkt. #43-6; Ex. G, Dkt. #43-7.

14  Baker v. Lab. Corp. of Am., No. C07-1664 MJP, 2008 WL 4812128, at *2 (W.D. Wash. Nov. 4,

15  2008) ("A defendant who can show that its employee would have been terminated regardless of

16  the decision to take medical leave eliminates the possibility that there exists a causal connection

17  between the leave and the termination."). CBS generally went through a written documented

18  process of performance expectations for employees who were not hitting the expectations of

19  their supervisors and were out of their probationary period of one year. Dkt. #53 at 6; see Silke

20  Decl. II at ¶ 3. Plaintiff introduces no evidence to show that he was put on the Plan because of

21  his leave. Ex. E, Dkt. #43-5 at 27–28; Ex. F, Dkt. #49-6 at 1–2; see Urrutia v. BNSF Ry. Co.,

22  No. C09-215RSM, 2010 WL 4259246, at *4 (W.D. Wash. Oct. 22, 2010). Finally, there is no

23  dispute that plaintiff voluntarily resigned. Ex. E, Dkt. #43-5 at 10. Defendants are entitled to

24  summary judgment on plaintiff's FLMA and WLA claims.

25      **D. Failure to Accommodate under the WLAD**

26

27      "There are two types of disability discrimination claims under the WLAD: failure to

28  accommodate and disparate treatment." Stewart v. Snohomish Cty. PUD No. 1, 262 F. Supp. 3d

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 15

1089, 1102 (W.D. Wash. 2017), aff'd sub nom. Stewart v. Snohomish Cty. Pub. Util. Dist. No.
1, 752 F. App'x 444 (9th Cir. 2018) (citation omitted). Plaintiff brings both claims.

"An employee qualifies for reasonable accommodation if he or she has an impairment
that substantially limits his or her ability to perform the job, or the employer has notice of the
impairment and medical documentation establishes a reasonable likelihood that engaging in job
functions without an accommodation would aggravate the impairment to the extent that it would
create a substantially limiting effect." Studley v. The Boeing Co., No. C15-1150RSL, 2016 WL
6298773, at *3 (W.D. Wash. Oct. 27, 2016) (citation omitted). To sustain a failure to
accommodate claim under the WLAD, plaintiff must show that (1) he had a disability; (2) was
qualified to perform the essential functions of his job; (3) gave his employer notice of his
disability and limitations; and (4) upon notice, the employer failed to adopt measures available
to it in order to accommodate the disability. Golafale v. Swedish Health Servs., No. C14-
1683JLR, 2016 WL 1367366, at *11 (W.D. Wash. Apr. 5, 2016) (citations omitted).

"Once the employer is aware of a disability that may require accommodations, … the
WLAD impose[s] a duty on the employer and the employee to engage in a good faith,
interactive process to identify and provide reasonable accommodations." Golafale v. Swedish
Health Servs., No. C14-1683JLR, 2016 WL 1367366, at *11 (W.D. Wash. Apr. 5, 2016)
(citation omitted). "Employers should meet with the employee who requests an accommodation,
request information about the condition and what limitations the employee has, ask the
employee what he or she specifically wants, show some sign of having considered employee's
request, and offer and discuss available alternatives when the request is too burdensome." Reed
v. Kindercare Learning Centers, LLC, No. C15-5634BHS, 2016 WL 7231454, at *6 (W.D.
Wash. Dec. 14, 2016) (citation and internal quotation marks omitted).

During his deposition, plaintiff testified that he did not inform Fashana, Johnson,
McCarthy or Olson of any disabilities during his interview. Wesley Dep. at 41:22–42:2. Nor did
he ask for any accommodations. Id. at 42:3–8. Fashana does not "recall any time that Plaintiff
informed him that Plaintiff or his family member suffered [from] 'depression' or 'anxiety.'" Ex.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 16

H, Dkt. #43-8 at 10–11. Neither does Johnson. Ex. I, Dkt. #43-9 at 10. In his declaration, plaintiff states that he "personally informed Defendants during [his] initial interview that [he] suffered [from] depression that was aggravated by [his] brother's recent death and that [his] struggles from depression were the reason that [he] was terminated from Townsquare." Wesley Decl. at ¶ 3. "[A] party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." Yeager v. Bowlin, 693 F.3d 1076, 1080 (9th Cir. 2012) (citation omitted). "This sham affidavit rule prevents 'a party who has been examined at length on deposition' from 'raising an issue of fact simply by submitting an affidavit contradicting his own prior testimony,' which 'would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.'" Id. (citation omitted). The inconsistency is "clear and unambiguous". DiNardo v. Wow 1 Day Painting, LLC, No. C16-1600JLR, 2018 WL 513584, at *7 (W.D. Wash. Jan. 23, 2018). The Court finds that plaintiff did not notify defendants of his depression at the time of his interview.

Plaintiff did indicate on his Personal Information Form that he was an individual with a disability. Ex. B, Dkt. #50-2; see Wesley Decl. at ¶ 3. However, there is no evidence that he ever explained to anyone at CBS what his disability was or what accommodations he needed. See Ex. A, Dkt. #43-1 at 43–54; Ex. E, Dkt. #43-5 at 24–26. Kelley v. Amazon.com, Inc., No. 12-CV-5132-TOR, 2013 WL 6119229, at *5 (E.D. Wash. Nov. 21, 2013), aff'd, 652 F. App'x 524 (9th Cir. 2016) ("It is undisputed that Plaintiff never notified [her employer] of a possible connection between her performance problems and her disabilities. As a result, [her employer] had no reason to know that a performance-related accommodation may have been in order."). "Generally, it is inappropriate for the employer to focus discussion about a performance or conduct problem on an employee's disability. … It is generally preferable that the employee initiate any discussion on the role of the disability." Id. at *5 (quoting U.S. Equal Emp't Opportunity Comm'n, The Americans With Disabilities Act: Applying Performance and Conduct Standards to Employees with Disabilities, available at http://www.eeoc.gov/facts/performance-conduct.html). Plaintiff's failure to provide notice also

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 17

obviates the need on CBS's part to engage in an interactive process. "[A]n employee may not simply inform her employer that [he] suffers from a disability and assume that the employer will discover (and subsequently accommodate) each and every limitation caused by the disability. To trigger the employer's duty to engage in the 'interactive process,' the employee must inform the employer of both the disability and the resulting limitations." Id. at *5.

Plaintiff did not request any accommodations from CBS that were denied. His health care provider did not indicate a need for them in his "Certification of Health Care Provider for Employee's Serious Health Condition",. Ex. E, Dkt. #43-5 at 24–26. The provider only mentioned a reduced work schedule (without any specifics) and plaintiff's need to be absent from work during "flare-ups". Ex. E, Dkt. #43-5 at 24–26. There is no dispute that CBC granted plaintiff's requests for medical leave to attend his appointments and the ability to occasionally work from home. Wesley Dep. at 149:24–150:6; Baker Dep. II at 113:23–114:8; 192:20–193:14. Castellano v. Charter Commc'ns, LLC, No. 3:12-CV-05845-RJB, 2013 WL 6086050, at *10 (W.D. Wash. Nov. 19, 2013).

Rather, plaintiff argues that CBS failed to reasonably accommodate him in that it did not reduce his budget requirements and used his FMLA leave as a negative factor in the decision to put him on the Performance Improvement Plan. Liston, 311 F. App'x at 1002. As discussed previously, plaintiff has produced no evidence to show that the Plan marked a change in his employment conditions or that he was put on it because of his leave. "An employee with a disability must meet the same production standards, whether quantitative or qualitative, as a non-disabled employee in the same job. Lowering or changing a production standard because an employee cannot meet it due to a disability is not considered a reasonable accommodation." Kelley, 2013 WL 6119229 at *9 (quoting Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, EEOC Notice No. 915.002, October 17, 2002, available at http://www.eeoc.gov/policy/docs/accommodation.html). CBS was not required to grant plaintiff more lenient targets as a matter of law. Id.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 18

Finally, defendants have shown that plaintiff was not "qualified to perform the essential functions of his job". Golafale, 2016 WL 1367366 at *11. He took time off for medical appointments between January and March 2015, and medical leave between November 2015 and January 2016. Ex. A, Dkt. #43-1 at 43–54; Ex. E, Dkt. #43-5 at 24–26. Yet he consistently failed to meet his budgets before and after his appointments and leave. Ex. E, Dkt. #43-5 at 41–42; Ex. F, Dkt. #43-6; Ex. G, Dkt. #43-7. Kelley, 652 F. App'x at 526 ("The record demonstrates that [plaintiff] failed to create a jury issue regarding whether she can deliver adequate customer service with or without a reasonable accommodation. Over the course of at least eight months, she regularly failed to meet the … standard required for her team even after repeated attempts by [her employer] to improve her performance."). Defendants are entitled to summary judgment on plaintiff's failure to accommodate claim.

**E. Disparate Treatment under the WLAD**

The burden-shifting scheme in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) applies to claims under the WLAD. Poe v. Waste Connections US, Inc., 371 F. Supp. 3d 901, 911 (W.D. Wash. 2019). "[A]n employee challenging an adverse employment action has the initial burden of establishing a prima facie case of discrimination." Id. (citation omitted). "The burden then shifts to the employer to provide a legitimate, nondiscriminatory reason for the adverse employment action. If the employer does so, then the burden shifts back to the employee to prove that the reason given by the employer was pretextual." Id. (citation omitted). "The plaintiff must make a prima facie case by showing that (1) they belong to a protected class, (2) they were qualified for the position (they were performing their job in a satisfactory manner), (3) they were subjected to an adverse employment action, and (4) they were replaced by or were treated less favorably than a person outside the protected class." Id. (citing McDonnell Douglas, 411 U.S. at 802). The requisite degree of proof "on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." Id. (citation omitted). Plaintiff claims disparate treatment on the grounds of his disability, his race, and his gender.

1     Plaintiff's depression is a disability under the WLAD. Poe, 371 F. Supp. 3d at 909

2  (citation omitted). However, plaintiff has not shown that he was otherwise performing his duties

3  in a satisfactory manner. McElwain v. Boeing Co., 244 F. Supp. 3d 1093, 1098 (W.D. Wash.

4  2017) ("even viewing these allegations in the light most favorable to [the plaintiff], the court

5  draws only the inference that [the plaintiff] was performing satisfactorily at some periods during

6  his employment, not that he was doing satisfactory work during the time leading up to his

7  termination."). As previously discussed, the Plan was not an adverse employment action.

8  Neither was plaintiff's transfer from a DSS to an AE. See Compl. at ¶¶ 3.13–3.14. There was no

9  change in his salary, see Ex. E, Dkt. #43-5 at 43–49; Dkt. #48 at 4, and CBS had simultaneously

10  made changes to the commission structure applicable to all AEs. Finally, plaintiff resigned

11  voluntarily. Ex. E, Dkt. #43-5 at 10. Plaintiff does not argue in his response that the transfer,

12  resignation, or Plan were adverse employment actions. Rather, he argues that CBS discriminated

13  against him by assigning billing accounts to Macdonald instead of him. Dkt. #48 at 16–17.

14     Even assuming that plaintiff was performing satisfactorily in his job and the burden

15  thereby shifted to CBS to show a "legitimate, nondiscriminatory reason for the adverse

16  employment action", CBS would succeed. Poe, 371 F. Supp. 3d at 911. Preliminarily, there is no

17  indication that defendants were even aware that plaintiff had a disability that impaired his ability

18  to perform his job functions in any way. Wesley Dep. at 41:22–42:2; Ex. H, Dkt. #43-8 at 10–

19  11; Ex. I, Dkt. #43-9 at 10. Regardless, local management took a variety of factors into

20  consideration in these assignments. Ex. J, Dkt. #43-10 at 4; Ex. K, Dkt. #43-11 at 4. Fashana

21  states that Macdonald worked hard, learned quickly, and delivered results. Fashana Decl. at ¶ 2.

22  By contrast, plaintiff "did not demonstrate the same skill level, even though he had much more

23  media sales experience. Based on his experience in the industry, he should have been able to

24  develop his own book of business and generate sales without 'lucrative' accounts being handed

25  to him. Ultimately, [plaintiff] did not deliver new business, or digital results, and was not

26  somebody [CBS] trusted to effectively manage a key account." Id. at ¶ 6. This is corroborated

27  by plaintiff's failure to meet his budgets, especially by comparison with his colleagues. Ex. E,

28

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 20

Dkt. #43-5 at 41–42; Ex. F, Dkt. #43-6; Ex. G, Dkt. #43-7; see McElwain, 244 F. Supp. 3d at 1098. The burden then shifts back to plaintiff to "prove that the reason given by the employer was pretextual." Poe, 371 F. Supp. 3d at 911. Plaintiff "fails to raise a material issue of fact that a discriminatory reason more likely motivated [CBS] or that its proffered explanation concerning" the assignment of accounts is "unworthy of credence." Ellorin v. Applied Finishing, Inc., 996 F. Supp. 2d 1070, 1093 (W.D. Wash. 2014).

The same is true of plaintiff's claims of race and gender discrimination. Dkt. #48 at 17–18. Plaintiff claims that the billing accounts were assigned to Macdonald because she was a Caucasian female. Defendants have discharged their burden to show a legitimate, non-discriminatory reason for the assignments. Danielson v. Yakima Cty., No. 10-CV-3115-TOR, 2013 WL 2639241, at *5 (E.D. Wash. June 12, 2013). Plaintiff has failed to demonstrate that the assignments were a pretext for race or gender discrimination. Id. at *5–6.

### F.  Wrongful Termination Claim

"A constructive discharge occurs when a person quits his job under circumstances in which a reasonable person would feel that the conditions of employment have become intolerable." Gibson v. King Cty., 397 F. Supp. 2d 1273, 1281 (W.D. Wash. 2005) (citation omitted). "Generally, whether working conditions have risen to an 'intolerable' level is a jury question." Id. (quoting Sanchez v. City of Santa Ana, 915 F.2d 424, 431 (9th Cir. 1990), cert. denied, 502 U.S. 957 (1991)). "But there must be evidence presented that an employer has deliberately acted to make an employee's working conditions so intolerable that the employee was forced to resign." (citations omitted). "Courts typically look for either aggravating circumstances or a continuous pattern of discriminatory treatment." Id. (citations and internal quotation marks omitted).

Plaintiff has not presented any evidence of intolerable working conditions. His complaint against Fashana was investigated and determined to be unfounded. Baker Dep. at 71:14–73:12; see Ex. E, Dkt. #43-5 at 55. Plaintiff argues in his response that he was denied billing accounts

1  despite "literally beg[ing] for them the whole time that he was employed" and was expected to

2  adhere to his budget requirements despite his medical leave. Dkt. #48 at 20–21. He has not

3  shown that his "working conditions deteriorate[d] … to the point that they bec[a]me

4  'sufficiently extraordinary and egregious to overcome the normal motivation of a competent,

5  diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or

6  her employer.'" Cloer v. United Food & Commercial Workers Int'l Union, No. C05-1526JLR,

7  2007 WL 601426, at *7 (W.D. Wash. Feb. 22, 2007) (citation omitted). Defendants are entitled

8  to summary judgment on plaintiff's wrongful termination claim.

9                                          **<u>CONCLUSION</u>**

10

11         For all the foregoing reasons, defendants' motion is GRANTED. Plaintiff's claims for

12 violations of the Washington Law Against Discrimination, for violations of the Family Medical

13 Leave Act and the Washington Family Leave Act, for wrongful termination in violation of

14 public policy, and for failure to accommodate, <u>see</u> Compl. at ¶¶ 4.1–4.4, are DISMISSED.

15         DATED this 19th day of September, 2019.

16

17

18                                          _MNT S Lasnik_

19                                          Robert S. Lasnik
                                            United States District Judge
20

21

22

23

24

25

26

27

28

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 22